UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CASE NO. 1:11-CR-00015-R

UNITED STATES OF AMERICA     PLAINTIFF

v.

SAMUEL WIX AND
MARCELLA DOZIER     DEFENDANTS

**MEMORANDUM AND ORDER**

Before the Court is Defendants Samuel Wix and Marcella Dozier's ("Wix" or "Dozier" or collectively "Defendants") motion to suppress (DN 17). On February 29, 2012, a suppression hearing was held in Bowling Green, Kentucky, before Magistrate Judge Robert Goebel. Larry E. Fentress, AUSA, appeared on behalf of the Government. Laura R. Wyrosdicsk, Federal Public Defender, appeared on behalf of Wix. Official Court Reporter Michelle E. Kerr recorded the proceedings.

The issue in controversy during the February 29 hearing was whether Dozier had consented to a police entry of a mobile home in Allen County, Kentucky. Dozier could not be located in time to testify for the hearing. Given her absence, the Government's witnesses on the issue of consent went unchallenged. Between the hearing and the Court's ruling, law enforcement apprehended Dozier.

To create a thorough record, the Court held another suppression hearing to listen to Dozier's testimony. The second hearing occurred in Bowling Green, Kentucky, on April 23, 2012, before Senior District Court Judge Thomas B. Russell. Larry E. Fentress appeared on behalf of the Government. Laura R. Wyrosdicsk appeared on behalf of Wix. Jason C. Hays,

1

appointed counsel, appeared on behalf of Dozier. Terri Turner, official court reporter, recorded the proceedings.

Following the second hearing, the parties submitted briefing on the pertinent legal issues (DN 44; DN 49; DN 50). The Court has considered the testimony at the hearings, the attorneys' arguments, and the present briefing. The Court issues its ruling below.

## BACKGROUND

The events in question transpired on September 16, 2010, at 320 Tommy Wix Road in Allen County, Kentucky (herein "Property"). The Property has a number of structures on it, including several mobile homes and a stand-alone garage. The stand-alone garage is located roughly 25 to 30 feet away from the nearest mobile home. Individuals on the Property have a clear view of the driveway leading up to the cluster of buildings.

During midday on September 16, a caravan of law enforcement vehicles arrived at the Property. The officers hoped to arrest Wix pursuant to an arrest warrant for several automobile violations, including driving without insurance and an operator's license. The principal law enforcement officers involved in the current controversy are Officer Mike Winpee with the Kentucky State Police Drug Task Force and Deputy Charles Drummond of the Allen Country Sheriff's Department. Both testified at the hearings. Before this incident, the officers were familiar with Wix and his relatives by virtue of their previous criminal behavior.

When the police cruisers pulled onto the driveway, Winpee and Drummond saw four men standing on the Property. Three were clustered in front of the garage's vehicle bay and the fourth was located behind one of the mobile homes. Winpee recognized Wix as one of the men near the garage. Three of the four men, including Wix, took flight almost immediately. Winpee and

2

Drummond headed in the general direction of the garage to find Wix while the remaining officers fanned out across the Property to corral the other escapees.

Winpee testified that he saw Wix run from the garage toward the nearest mobile home and circle around the structure's left side. Winpee left his vehicle and gave chase. When Winpee reached the left side of the mobile home, he did not see Wix but encountered an addition to the structure along with a separate entrance. The presence of the doorway and his failure to find Wix led Winpee to believe that Wix had fled into the mobile home. Winpee walked back to the main entrance of the mobile home and knocked on the door.

The series of events following the knock is difficult discern in light of Winpee's poor recollection and Dozier's summary denials of Winpee's version. According to Winpee, Dozier answered the door, which prompted him to ask if Wix was inside. Dozier said he was not and told Winpee to check the garage. HR, DN 36 p. 11. At this point, Winpee admits that Dozier tried to close the door but either decided against it or failed in the endeavor. HR, DN 36 p. 11, 26. Despite the confusion on why Dozier could not shut the door, Winpee insists he did nothing to prevent her from doing so. HR, DN 36 p. 27. Winpee then asked to enter the mobile home to see if Wix was inside. At the first suppression hearing, Winpee was unsure whether Dozier verbally agreed to let him in or simply stepped out of the doorway and permitted him to enter. DN 36 at 11-12. When confronted with a police report on cross examination, Winpee reoriented his testimony to match the document. HR, DN 36 p. 18. During the second suppression hearing, Winpee was adamant that Dozier consented by stepping out of the doorway. HR, DN 41 p. 15. In assessing Winpee's demeanor during the second hearing, the Court finds that these alternating stories stem from a poor memory rather than some nefarious motive on Winpee's part.

Drummond's testimony provides little on the issue of Dozier's consent. Once out of the cruiser, he approached the garage to check if Wix was still inside. Drummond made an initial sweep of the building but discovered it empty and a doorway in the rear facing the mobile home in the direction Wix had gone. Drummond then proceeded toward the mobile home. He observed Winpee standing on the front porch speaking with Dozier. When Drummond reached the porch, Winpee informed him that Dozier would permit them to enter the residence and look for Wix. HR, DN 36 p. 41. Drummond remembers that Dozier never objected to their entry or sweep of the residence but admits he never heard or saw her expressly consent either. HR, DN 36 p. 41.

At the second suppression hearing, Dozier provided a very different account of her interaction with Winpee. Dozier was napping on a couch in the mobile home when a knock at the door woke her up. HR, DN 41 p. 6. She partially opened the door and encountered Winpee on the landing. Without identifying himself as a police officer, Winpee asked if Wix was inside. HR, DN 41 p. 6-7. Dozier responded in the negative and suggested Winpee check the garage. HR, DN 41 p. 7. As she tried to close the door, Winpee placed his arm between the door and the frame to stop the progress of the door. HR, DN 41 p. 7. This gesture apparently drew Dozier out from the entryway onto the porch, whereupon Winpee took her by the arm and escorted her to the garage. HR, DN 41 p. 7-8. She says she was not present for the sweep of the mobile home or the subsequent search pursuant to the warrant. HR, DN 41 p. 8. Dozier denies she agreed physically or verbally to the initial sweep. HR, DN 41 p. 7-8.

Either way, Winpee and Drummond entered the mobile home together and made a quick, and ultimately unsuccessful, search for Wix. They did however observe a number of incriminating items. In the kitchen, Winpee noticed iodine, coffee filters, sea salt, baggies and a magazine on the topic of marijuana. Winpee asserts that these items (save the magazine) are used

4

in the manufacture of methamphetamines. Most concerning to the officers was the discovery of two 5-by-6 gallon water bottles interconnected with tubes and clamps. After a cursory examination, the officers thought the device was a hydrogen chloride ("HCL") gas generator, used to make methamphetamines. HR, DN p. 14, 43. Having come up empty in their search for Wix, they promptly left the mobile home. The officers allege that only after their sweep was Dozier escorted out the building for her own safety.

Outside, Winpee and Drummond discussed the suspicious items they had seen in the mobile home. HR, DN 36 at 53. Each believed the apparatus with the bottles, tubes, and clamps was used in the production of methamphetamines. This suspicion was only confirmed by the presence of the ingredients for methamphetamines in the kitchen and the discovery of another possible HCL gas generator on the mobile home's front steps. Drummond eventually left the Property to procure a search warrant for the mobile home.

The warrant was executed later in the day. The police found six ounces of marijuana, drug paraphernalia, and a sawed-off shotgun. After closer examination, what the officers had suspected were HCL gas generators was in fact a contraption for making homemade wine.

On June 8, 2011, Wix and Dozier were named in a two-count indictment, charging them with conspiring to knowingly and intentionally manufacture methamphetamines and possession of a shotgun with a barrel less than eighteen inches in length. Indictment, DN 1.

## STANDARD

"The Fourth Amendment provides that individuals shall be free from warrantless unreasonable searches and seizures in their 'persons, houses, papers, and effects.'" *Hardesty v. Hamburg Tp.,* 461 F.3d 646, 651 (6th Cir. 2006) (quoting U.S. Const. Amend. IV). The amendment "protects people, not places, and provides sanctuary for citizens wherever they have a

5

legitimate expectation of privacy." *Minnesota v. Olson,* 495 U.S. 91, 96 n. 5 (1990) (citation omitted). "[The] capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois,* 439 U.S. 128, 143 (1978). It is axiomatic that the defendant bears the burden to show a privacy interest in the place searched. *United States v. Whitehead*, 415 F.3d 583, 587 (6th Cir. 2005).

The Supreme Court has emphasized when it comes to Fourth Amendment protection "[i]n none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home." *Payton v. New York,* 445 U.S. 573, 589 (1980); *see also Ingram v. City of Columbus,* 185 F.3d 579, 586 (6th Cir. 1999). An exception to this rule exists when a homeowner gives an officer "voluntary consent" to search the house. *Ingram,* 185 F.3d at 587; *United States v. Rohrig,* 98 F.3d 1506, 1515 (6th Cir. 1996). "It is well-settled that a person may waive his Fourth Amendment rights by consenting to a search. Consent to a search may be in the form of words, gesture, or conduct. In whatever form, consent has effect only if it is given freely and voluntarily." *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (internal quotations and citations omitted). The government bears the burden to show by a preponderance of the evidence that consent to a warrantless search was freely and voluntarily given. *United States v. Hinojosa,* 606 F.3d 875 (6th Cir. 2010).

## DISCUSSION

Dozier and Wix move to suppress the fruits of the search warrant, arguing Winpee violated their Fourth Amendment rights when he entered the mobile home without Dozier's consent. They also assert the search warrant was founded upon the officers' false statements and should be set aside. The Government counters with three arguments of its own. It claims neither Dozier

nor Wix have demonstrated they had a legitimate expectation of privacy in the mobile home, the precedent of *Payton v. New York* permitted the officers to enter the mobile home and look for Wix with or without Dozier's consent, and the weight of the evidence shows Dozier agreed to the officers' entry.

I.   Legitimate expectation of privacy

The Government states this motion is improper because Wix and Dozier have not shown that they have a subjective expectation of privacy in the mobile home.   The evidence presented on the ownership of the mobile home and who resided within was, at best, peripheral to the proceedings.   At the first suppression hearing, certain defense witnesses said that the Property and structures on it were owned by Clifford Wix, the uncle of Samuel Wix.   HR, DN 36 p. 58, 61.   Dozier corroborated Clifford Wix's ownership of the Property and the mobile home.   HR, DN 41, p. 9.   Although Dozier said she stayed at the mobile home "a lot" with Wix, she acknowledged that she lived permanently with her sister.   HR, DN 41 p. 9.   Dozier did not offer direct evidence on the living arrangements of Wix, but in her responses to Government counsel's inquiries, she used the word "we" to describe her connection to the mobile home:

> Question: Ms. Dozier, how is it that you came to be living there?
> Answer: We wasn't really living there.   We stayed there a lot.
> . . .
> Question: But you weren't [in the trailer] the night before?   You don't remember, or you weren't?
> Answer: I don't think we were, no.
> Question: Okay.   All right.   Well, I just wanted to be clear on that point.   So you didn't live there.   You just stayed there every once in a while when [Sam Wix] took you over there with him, right?
> Answer: Uh-huh [affirmative].

HR, DN 41 p. 9-10. From the context of these statements, the Court can safely presume Dozier is referring to Wix and herself when she used the term "we." Still, her testimony does not establish with any certainty the permanent occupants of the mobile home.

Copies of Wix's arrest warrant and the search warrant are inconclusive on who lived in the mobile home as well. The arrest warrant lists Wix's address as 1826 Highland Church Road, Scottsville, Kentucky. The search warrant has Wix's residence as the mobile home on the Property. While the address from the bench warrants may have been outdated considering the age of the charges, the differing addresses is something the parties did not reconcile during the hearings. The Court is left to guess which document is accurate.

"In moving to suppress evidence, it is the duty of the moving party to show by a preponderance of the evidence that he/she was personally aggrieved by the alleged search and seizure because it invaded his/her subjective expectation of privacy which society is prepared to recognize as reasonable." *United States v. Carr*, 939 F.2d 1442, 1444 (10th Cir. 1991) (citation omitted). Certainly, the primary residents of a dwelling are afforded the constitutional protections of the Fourth Amendment. The Supreme Court has also extended the Fourth Amendment's protections to overnight guests of a residence. *See Minnesota v. Carter*, 525 U.S. 83, 89-90 (1998); *Minnesota v. Olson*, 495 U.S. 91, 96 (1990). The Court has expressly distinguished between overnight guests and those who were merely present in the residence as a result of the homeowner's consent. *Carter*, 525 U.S. at 90.

In the context of guests in a residence, the Sixth Circuit has broadly interpreted the Fourth Amendment's protections. Overnight guests staying in a residence's common area have standing to challenge a police intrusion and search. *See United States v. Pollard,* 215 F.3d 643, 647 (6th Cir. 2000) (privacy interest existed for occasional overnight guest who was allowed to stay in

residence alone and kept personal belongs in closet). Non-overnight guests have also been permitted to challenge the search of personal items kept in a third-party's residence. *United States v. Washington*, 573 F.3d 279, 283 (6th Cir. 2009) (citing *United States v. Waller,* 426 F.3d 838, 844 (6th Cir. 2005)). Suffice it to say, the appeals court has "generously" interpreted the reach of the Fourth Amendment as it pertains to temporary residents of a dwelling. *See id*.

Nevertheless, this generosity does not arise without some measure of proof by a defendant. Whether an informal sleeping arrangement creates a reasonable expectation of privacy naturally begets a fact-dominated inquiry for a court. Criminal defendants hoping to establish Fourth Amendment standing offer a variety of evidence to show a reasonable expectation of privacy. Factors that courts have considered include how often the defendant stayed in the dwelling, *e.g.*, *United States v. Love,* 70 F.3d 116, at *4 (6th Cir. 1995) (table) (defendant did not have expectation of privacy in mother's house as he was not an overnight guest and had moved out six months before the search), whether the defendant maintained personal belongings in the residence, *e.g.*, *United States v. Robertson,* 297 F. App'x 722, 726 (10th Cir. 2008) (defendant had no reasonable expectation of privacy when hotel room was not registered in his name and "no personal items indicating an overnight stay were present"), whether the defendant provided any sort of remuneration for the privilege of staying there, *e.g.*, *United States v. McRae,* 156 F.3d 708, 711 (6th Cir. 1998) (no expectation of privacy where defendant was squatting in building and did not pay rent to the owners of the structure), or whether the defendant could come and go freely, *e.g.*, *United States v. Davis,* 932 F.2d 752, 756–57 (9th Cir. 1991) (where defendant had key to apartment, could come and go freely, and stored items in an apartment, he had a reasonable expectation of privacy).

Too many questions exist to accurately measure Defendants' legitimate expectation of privacy in the mobile home. How often did Defendants spend the night in the mobile home and on the Property? The Court cannot possibly measure with any accuracy the subjective statement of Dozier that Wix and she stayed there "a lot." When was the last time Dozier and Wix were guests in the mobile home? Dozier admitted during her testimony that she did not spend the previous night in the trailer and the Court does not have additional information on the subject. Did Defendants have permission to stay there from the owner, Clifford Wix? It may be safe to assume so, but no direct evidence on this point was presented during either hearing. Were there any personal belongings of Defendants in the mobile home? Dozier did not offer any proof on this matter and Wix's silence is impossible to measure. Were Defendants providing Clifford Wix some sort of compensation to stay in the mobile home? Again, there is a deficiency in the record on this issue. Did Defendants have a key to mobile home and could they come and go without first obtaining permission from Clifford Wix? No relevant information was offered in this regard. The only verifiable information about which the Court can be sure is Defendants did not own the mobile home and they did not stay there the night before the police raided the Property.[1] HR, DN 41 p. 9-10.

Defendants undoubtedly possessed some connection to the mobile home. However, "the act of staying overnight at a third party residence does not automatically entitle a defendant to the protections of the Fourth Amendment." *United States v. Hunt,* No. 2:07–CR–284–WKW, 2008 WL 4080770, at *3 (M.D. Ala. Sept. 3, 2008). The evidence Defendants submitted to the Court

---

1. With her response to the Government's brief, Dozier has introduced police records created during the time of her arrest where she states she stayed at the mobile with some frequency. *See* DN 49-1; DN 49-2; DN 49-3. The Court chooses to accept her testimony rather than these eleventh-hour exhibits attached to her memorandum. Dozier said under oath that she did not live in the mobile home, that Clifford Wix owned the Property, and that she had not stayed there the night before. This evidence outweighs the statements recorded by the police during her interrogation.

falls short of establishing an expectation of privacy in the mobile home. For the Court to find otherwise would be to apply guesswork and conjecture to the present record. Accordingly, Defendants' motion to suppress is improper.

II. Effect of the arrest warrant

The Government contends the police were permitted to enter the mobile home irrespective of Dozier's consent because they possessed a valid arrest warrant for Wix. Since Winpee and Drummond were lawfully in the mobile home searching for Wix, the Government insists the officers were not required to ignore the incriminating items they encountered.

"The Supreme Court held in *Payton v. New York,* 445 U.S. 573 (1980), that a warrantless entry into a home is generally not constitutional, but that a valid arrest warrant permits forcible entry into a suspect's home to search for and arrest the suspect." *Shreve v. Jessamine Cnty. Fiscal Court*, 453 F.3d 681, 688-89 (6th Cir. 2006). *Payton*'s rule is not restricted to felony warrants; the police may force entry into a suspect's residence to effectuate a misdemeanor arrest warrant as well. *See id.* (constitutional rights of arrestee not violated where police broke into the arrestee's house and to execute a misdemeanor arrest warrant); *United States v. Mullikin*, 534 F. Supp. 2d 734, 739-40 (E.D. Ky. 2006) (collecting case where entry of a residence was permitted on arrest warrant for misdemeanor). Furthermore, officers acting on an arrest warrant may enter a third-party's residence to secure a suspect when they possess probable cause to believe the suspect is present.[2] *United States v. Block*, 378 F. App'x 547, 549-50 (6th Cir. 2010); *United States v. Hardin*, 539 F.3d 404, 426 (6th Cir. 2008). Once inside, the officers may sweep the residence for

---

2. In light of the finding that Wix and Dozier did not have an expectation of privacy in the mobile home, the Court considers it a third-party residence. If however the mobile home was Wix's permanent residence, the officers could certainly force entry to arrest him pursuant to the warrant. *United States v. Pruitt*, 458 F.3d 477, 486 (6th Cir. 2006) (Clay, J., concurring) ("[T]he *Payton* Court noted that a valid arrest warrant for the suspect, based on probable cause, would permit the police to enter a suspect's home to effectuate an arrest.").

the suspect and other persons where specific articulable facts led the officers to believe another person on the premises poses a danger. *United States v. Virgil*, 444 F.3d 447, 451 (5th Cir. 2006).

As the police possessed a valid arrest warrant and probable cause existed to believe Wix was inside the mobile home, Winpee's and Drummond's entry was not unconstitutional. Though Defendants argue the arrest warrants were merely smoke screens to justify the entry and search, no evidence exists to support such a belief. An arrest warrant for the non-payment of fines is a perfectly legitimate basis for a police intrusion into a residence. *See Mullikin*, 534 F. Supp. 2d at 739 ("[I]t does not matter that the warrant was a bench warrant for non-payment of fines, as opposed to a felony warrant, because the *Payton* rule is not limited to felonies."). Overall, there is nothing to suggest that the officers were disingenuous in their attempts to execute an arrest warrant on Wix when they entered the mobile home.

The inquiry for probable cause is straightforward as well. The arrival of the police on the Property prompted the flight of several individuals, including Wix. Winpee is resolute that Wix ran toward the mobile home during his escape and disappeared near its rear entrance. Drummond agreed that the rear exit from the garage led directly to the mobile home where Winpee had seen Wix run. These observations, combined with the proximity of the mobile home to the garage provided probable cause to believe Wix was hiding inside. *See Block*, 378 F. App'x at 550 (entry into third-party residence to arrest defendant constitutional even if the police were not certain it was the suspect who entered the house)*; El Bey v. Roop,* 530 F.3d 407, 418 (6th Cir. 2008) (where officers believed they saw target enter house, they could enter third-party residence to arrest him). The officers' observations, combined with the arrest warrant, permitted their entry.

III. Dozier's consent

12

The Government asserts the weight of the evidence shows Dozier consented to the initial entry of the mobile home. Dozier counters that the record is replete with inaccuracies in Winpee's recollection, which serve to eviscerate his claims of consent.

"[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 227 (1973). Consent must be "unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion." *United States v. Tillman,* 963 F.2d 137, 143 (6th Cir. 1992). "Factors to be considered are 'the characteristics of the party who allegedly consented, including the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; and whether the individual understands his or her constitutional rights.'" *Block*, 378 F. App'x at 551 (quoting *United States v. Ivy,* 165 F.3d 397, 402 (6th Cir. 1998)).

Even if Defendants had a privacy interest in the mobile home and *Payton*'s precedent did not authorize the intrusion, the officers' testimony convinces the Court that Dozier consented to the search. Admittedly, the recollection of Winpee on the precise method of consent, whether verbal or physical, is troublesome. Still, the similarities between Winpee's and Drummond's testimony corroborates their version of events. The officers agree that Dozier never protested the intrusion or objected to their presence while inside the structure. HR, DN 36 p. 15-16, 41. One would expect an occupant of a residence to offer verbal resistance to an unauthorized police entry. The officers also agree that the impetus for evacuating the trailer was their belief it contained a methamphetamine laboratory. Since the officers did not encounter the items that they misjudged to be a drug manufacturing operation until after entry into the mobile home, their joint recollection of this sequence weakens Dozier's contention that Winpee escorted her to the garage even before

the sweep. In short, the correlation between Winpee's and Drummond's testimony obviates the differing account by Dozier. The Court finds her recollection unpersuasive and rejects it.

Furthermore, Dozier admitted she was not threatened or coerced into opening the door and permitting the officers to enter. She testified that the only time she felt threatened or intimidated by the officers that day was when she was in the garage, far removed from the front door and the mobile home. HR, DN 41 p. 11. Dozier has not offered credible evidence that would permit the Court to conclude her agreement to search was anything but knowing and voluntary.

For these reasons, the Court finds that the Government has shown by a preponderance of the evidence that Dozier consented to the officers' entry into the mobile home.

IV.    Search Warrant

Belatedly, Wix adds another basis to suppress the fruits of the search – the officers supplied incorrect statements to secure the search warrant. He asserts that under *Franks v. Delaware*, 438 U.S. 154 (1978), the Court must discard the warrant given the false and reckless statements provided to the magistrate judge. Although this basis for relief was not addressed in his original motion to suppress or during the hearings, the Court confronts it on the merits.

"To establish probable cause adequate to justify issuance of a search warrant, the governmental entity or agent seeking the warrant must submit to the magistrate an affidavit that establishes 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010) (quoting *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009)). Great deference should be afforded the magistrate judge's determination of probable cause. *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000). "This circuit has long held that an issuing magistrate's discretion should only be reversed if it was arbitrarily exercised." *Id.*

Where the search warrant is premised on deliberately or recklessly false statements, a defendant may challenge the warrant and the magistrate judge's probable cause determination. "If the redacted affidavit, purged of recklessly and materially false statements, no longer establishes probable cause, then the court must hold the resulting search warrant invalid." *United States v. Elkins,* 300 F.3d 638, 649 (6th Cir. 2002) (citing *Franks,* 438 U.S. at 155-56) (footnote omitted). "[A] court considering whether the suppress evidence based on an allegation that the underlying affidavit contained false statements must apply a two-part test: (1) whether the defendant has proven by a preponderance of the evidence that the affidavit contains deliberately or recklessly false statements and (2) whether the affidavit, without the false statements, provides the requisite probable cause to sustain the warrant." *United States v. Charles,* 138 F.3d 257, 263 (6th Cir. 1998).

In the warrant's affidavit, Drummond offered the following description of what the officers saw inside and around the mobile home:

> While attempting to serve a warrant on Sam Wix[,] officers observed in plain view a 5 gallon water cooler modified into what appeared to be a HCL generator on the steps of the residence located at 320 Tommy Wix Road, Scottsville, Kentucky. Officers also observed drug paraphernalia, components and ingredients used in the manufacture of methamphetamine on the table just inside the residence. While clearing the residence[,] officers observed two 5 to 6 gallon water bottles with tubing, clamps, and fixtures and unknown liquids inside. The apparatus appeared to be cooking vessels for a red p. meth. lab.

Search Warrant Affidavit, p. 2. While a few differences exist between the affidavit's description and the officers' testimony during the hearings, they have a relatively benign effect on the affidavit's narrative. The discrepancies highlighted by Wix deal with whether it was Drummond or Winpee who saw the drug paraphernalia and the type of paraphernalia the officers encountered in their initial sweep. *See* Brief in Support of Motion to Suppress, DN 50 p. 15-16. The

comments that Wix targets do not show that the officers' description in the affidavit was patently false. Wix's argument that Drummond cannot recall exactly when he encountered the cooler on the front steps is equally frivolous. These variations between the officers' testimony and the affidavit fall well short of the "deliberately or recklessly false statements" necessary to justify a relief under *Franks*.

Furthermore, Wix does not dispute that the officers saw the two 5-to-6 gallon jugs with tubing, clamps, and fixtures inside the mobile home. The warrant's affidavit and the testimony at the hearing are unambiguous that the officers believed the apparatus was used in the production of methamphetamines. HR, DN 36 p. 31, 42. The misidentification of the multi-gallon bottles was not the result of a scheme or artifice, but instead a good faith mistake on the part of the officers. The discovery of ingredients for methamphetamines in the initial sweep buttressed their belief that the apparatus had a criminal use. The officer's decision to quickly evacuate the mobile home lends additional credence to their claims that they believed the structure contained a volatile methamphetamine laboratory. In short, the record demonstrates that the officers truly thought they had stumbled upon a drug production facility. Under these circumstances the warrant's probable cause determination is unassailable. *See United States v. Marihart*, 492 F.2d 897, 900 n. 4 (8th Cir. 1974) ("[I]f the officer reasonably believes facts which facially indicate a crime has been committed, then even if mistaken, she has probable cause for believing a crime has been committed."); *State v. Seagull*, 632 P.2d 44 (Wash. 1981) (probable cause existed where officer said he saw a marijuana plant even though it was actually a tomato plant); *see also Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990) ("Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some

mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability." (citation and quotation marks omitted)).

Finally, Defendants cannot overcome the good faith exception of *United States v. Leon*, 468 U.S. 897, 905 (1984). There, the Supreme Court decided that excluding evidence from a criminal trial was inappropriate where it was seized "in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." *Id*. at 905. Although Wix posits that the good faith exception is barred because the officers recklessly included false information in the affidavit, the record is devoid of evidence to support this allegation. The officers acted properly when they relied on the magistrate judge's probable cause determination.

## CONCLUSION

The Court agrees with the Government that Defendants have not shown a reasonable expectation of privacy in the mobile home, that the officers could enter the mobile home pursuant to a duly executed search warrant, and that the weight of the evidence shows Dozier consented to the search. Nor have Defendants presented evidence that the officers included deliberately false statements in the search warrant's affidavit. For these reasons, Defendants' motion to suppress is DENIED.